Filed 7/1/21  Starre v. March CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| RAVEN STARRE, | B304980 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC687258) |
| v. | |
| BROOKE MARCH et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Teresa A. Beaudet, Judge.  Affirmed.

MLG, Jonathan A. Michaels, Robert B. Smith, Kseniya Y. Stupak, and Afnan Shukry for Plaintiff and Appellant.

Jason M. Stone and Kelly P. Sorensen for Defendants and Respondents Brooke March, Scott Cervine, Amy Sheely, Beth Bayard, Debra Artura, and Steven Cervine.

Hanger, Steinberg, Shapiro & Ash, Marc S. Shapiro, and Kristina M. Parido for Defendant and Respondent Nancy Johnson.

\* \* \* \* \* \*

A multilevel marketing guru solicited money from several people to fund a yearlong reality TV show where participants would vie to be the first to gross $1 million in that year. The guru abandoned the show after 10 days of filming and did not return any of the funding. After some of the participants sent emails demanding refunds and after a former intern went rogue and created a website that falsely accused the guru of being a pedophile, she sued the participants for libel and intentional infliction of emotional distress. The trial court granted summary judgment to the participants because the undisputed facts established that they were not responsible for the libelous website and because the emails demanding a refund did not constitute "outrageous" conduct capable of supporting a claim for emotional distress. We affirm the judgment.

### FACTS AND PROCEDURAL BACKGROUND

I.      **Facts**

A.      *Plaintiff's expertise with the multilevel marketing industry*

Raven Starre (plaintiff) makes a living in the "multilevel marketing" industry. Within that industry, a person earns income by (1) keeping a percentage of the product sales she makes to customers, and (2) taking a percentage of the product

sales made by people in her "downline"—that is, sales made by the people she recruits to sell the same product. Plaintiff is so experienced in this industry that she conducts seminars on how to succeed.

**B.** ***Plaintiff's first reality TV venture fails***

In mid-2014, plaintiff came up with a new and different way to make money. She would coproduce a yearlong reality TV show where she would mentor 12 contestants on how to make a million dollars in the multilevel marketing industry in a year. The show would be called "One Year To A Millionaire," and even had its own snazzy acronym, "1Y2M."

Plaintiff recruited several participants for the show. Each paid a "participation fee" of $25,000, although some ended up paying in excess of $25,000. The parties dispute what the participants were to get for their money. The participants thought that they were paying (1) to participate in a yearlong show, and (2) for one year of plaintiff's mentorship with a multilevel marketing business. Plaintiff thought the participants were making a "non-refundable" payment for the "*opportunity* to be a participant in the show and [to] receive [her] transformational coaching." (Italics added.) At some point after the participants paid their "fee," plaintiff required them to sign a "Participation Agreement & Release," in which the participants (1) acknowledged that their earlier payment was "non-refundable," (2) agreed never to sue plaintiff and to release her from any and all liability, and (3) capped any recovery against her at a maximum of $30,000 in actual damages.

The show filmed for 10 days in December 2014 before plaintiff, in January 2015, scrapped the concept because it would

3

be "impossible" to earn one million dollars in a single year from multilevel marketing.

Plaintiff had received $336,000 in participation fees, and had allocated $60,000 to herself as her "fee."

### C. *Plaintiff's second reality TV venture fails*

At the same January 2015 meeting where plaintiff decided to scrap the 1Y2M reality TV show, she suggested using the participation fee money on a new and different TV project. The project would be a talk show about women's issues, where "women [would] talk[] about real raw topics." The concept was called "RAWomyn."

Plaintiff persuaded several of the participants in 1Y2M to contribute additional funds for the RAWomyn project.

Less than a month later, the RAWomyn show also "failed."

### D. *The fallout*

Plaintiff did not refund nearly any of the $25,000 participation fees for 1Y2M or the further contributions for the RAWomyn project and did not provide a year's worth of mentoring, although she continued to "*offer. . . coaching and mentoring.*"

#### 1. *Plaintiff's March 7 emails*

When several of the participants started to ask for a refund of their participation fees because the TV shows had failed and because plaintiff was not mentoring them, plaintiff sent out two group emails on March 7, 2015. In the first email, plaintiff apologetically declared that she "would like to take responsibility for th[e] fiasco" and promised to send each email recipient a settlement offer. In the second email sent just four hours later, plaintiff warned the same group that she had "screen shots" of the participants' "public" and "private Facebook, Twitter and

4

other social media conversations," and "strongly advise[d]" them "not to use [her] name . . . in any libel [sic] or slanderous way."

2.     *The participants' responsive emails*

Between March 7 and March 31, 2015, five of the 1Y2M participants—Brooke March (March), Debra Artura (Artura), Nancy Johnson (Johnson), Mika Shoemaker (Shoemaker), and Beth Bayard (Bayard)—sent responsive emails to plaintiff. In their emails sent on March 7 and March 8, respectively, March and Artura spelled out how much money they had given plaintiff, demanded to be "pa[id] back" and, if a refund was not forthcoming, indicated "[t]he world will know exactly what you are up to and what you have done." In their emails sent on March 26, March 27 and March 31, respectively, Johnson, Shoemaker and Bayard also spelled out the amount each had given plaintiff, demanded a refund of those amounts and, if a refund was not forthcoming, indicated that their "next steps" included filing a "criminal complaint" with the Federal Trade Commission, the Internal Revenue Service, the California Attorney General and/or the local police.

3.     *Discussion of possible website*

In June 2015, Johnson posted a message to a Facebook group that included March, Bayard, Shoemaker and Peter Kirkpatrick (Kirkpatrick). In that message, Johnson suggested "launch[ing] a website—something like ravenstarrewarning.com where we each . . . tell our factual and non-libelous story and . . . use the tools of search engine optimization to assure that anyone searching for info on [plaintiff] finds that site." To Johnson, the website would "warn others away from [plaintiff]" so that plaintiff "will not have gotten away with scamming us without recourse."

5

There was no discussion of launching a website containing any false information. What is more, none of the participants counseled anyone else to create such a website.

4. *Website created by "rogue" intern*

Kirkpatrick had worked as an intern during the 10 days that 1Y2M filmed. On his own and without the participation of anyone else, he launched a website under the domain name www.RavenStarreScam.com (the website). The website falsely accused plaintiff of sexually molesting her son, called her a "pedophile," posted photographs of her with her son, and falsely reported that her son had been taken from her by the authorities.

## II. Procedural Background

### A. *The pleadings*

In December 2017, and as pertinent here, plaintiff sued March and her husband, Artura and her husband, Johnson, Sheely, and Bayard (collectively, defendants) for libel and civil extortion.[1] She sought $5 million in compensatory damages as well as punitive damages.

In March 2019, plaintiff filed the operative second amended complaint against defendants.[2] Plaintiff alleges claims for (1) libel per se, (2) cyber stalking (in violation of Civil Code section

---

[1] Plaintiff also sued Kirkpatrick, Jason Starr, Kang Vang, Mindy Weathers, Shoemaker and Shoemaker's husband. Kirkpatrick, Starr, Vang and Weathers did not join in the motion for summary judgment at issue in this appeal. Although Shoemaker and her husband joined the motion, they were dismissed as defendants prior to the hearing on that motion.

[2] She added Chris Herriford as an additional defendant, but Herriford did not join the summary judgment motion at issue in this appeal, so will not be discussed further.

1708.7), (3) intentional infliction of emotional distress, (4) conspiracy to commit libel per se, (5) aiding and abetting libel per se, (6) conspiracy to intentionally inflict emotional distress, and (7) aiding and abetting the intentional infliction of emotional distress. She seeks $5 million in compensatory damages as well as punitive damages.

In its general allegations, the operative complaint alleges that "[b]eginning in 2015, [d]efendants . . . banded together and hatched a plan to emotionally and financially destroy [p]laintiff []. In furtherance of this, [] [d]efendants undertook two actions toward her. First, they created a website called RavenStarreScam.com, which contains a litany of false, derogative and libelous statements about the [p]laintiff. Second, they sent the [p]laintiff written communications demanding that she pay them money, under threat of filing false criminal complaints against her." The libel per se claim is based solely on the "creat[ion]" and "maintain[ance]" of the website. The intentional infliction of emotional distress claim is based upon the website and on the emails defendants sent in March 2015, which plaintiff alleges were an "outrageous" "shakedown . . . for money, under the threat of false criminal accusations."

B. *Motion for summary judgment*

In August 2019, defendants filed a motion for summary judgment or, in the alternative, summary adjudication.

On October 8, 2019, plaintiff filed her opposition to the motion. Plaintiff raised three new factual grounds to support her claims for libel per se and intentional infliction of emotional distress—namely, that defendants had (1) distributed flyers at an event where she spoke and which read, "SCAM ALERT! RAVEN STARRE . . . You need to know her MLM [multilevel marketing]

7

mentorship is a complete scam. She charged 12 people $25,000 each [for] a year for mentorship and then walked away saying it was too hard to make $ in MLM. She kept every dollar of it and refused any requests for refunds. #MLMmentorscam," (2) posted a YouTube video "outlining how they were 'scammed' by" plaintiff, and (3) falsely informed ARIIX, whose products plaintiff devoted some of her time to marketing, that plaintiff was collecting fees for "preferential placement in her downline," which prompted ARIIX to cancel its contract with plaintiff.[3] Plaintiff had learned of the flyer no later than November 20, 2018, when Shoemaker discussed it during her deposition, and had learned of defendants' alleged interference with ARIIX in July 2015 emails with ARIIX regarding the termination of her contract. None of these facts were alleged in any of the three iterations of plaintiff's complaint.

Following receipt of defendants' reply, the trial court issued a tentative ruling to grant summary judgment. After a hearing, the trial court stuck with its tentative ruling and granted summary judgment. As pertinent to this appeal, the court found that defendants were entitled to judgment on plaintiff's libel per se claim because she had not introduced any evidence that *defendants* were involved with the website; the only evidence indicated that Kirkpatrick was solely responsible for it. The court also found that defendants were entitled to judgment on plaintiff's intentional infliction of emotional distress claim because "sending one email demanding payment for a failed

---

[3]    Plaintiff also raised a fourth factual ground—namely, that the defendants had reported her to child protective services. However, that report was based on alleged neglect and not sexual abuse, and is not an asserted basis for error in this appeal.

multi-level marketing scheme" was not "outrageous" as a matter of law. The court declined to consider the evidence regarding the flyer, the YouTube video, or ARIIX because they were outside the scope of the operative complaint. The court denied plaintiff's oral request for leave to file a third amended complaint adding new allegations regarding the flyer, YouTube video, or ARIIX because it was "not a correct remedy" to do so at time of the summary judgment hearing.

Following the entry of judgment, plaintiff filed this timely appeal.

## DISCUSSION

Plaintiff argues that the trial court erred in (1) granting defendants' summary judgment motion and (2) denying her oral request for leave to amend her complaint.[4]

---

[4] In her reply brief, plaintiff asks us to strike the two respondents' briefs filed, respectively, by Johnson and by the remaining defendants, on the ground that the combined word count of both briefs exceeds the 14,000-word limit applicable had they filed a single, consolidated respondents' brief. (Cal. Rules of Court, rule 8.204(c).) Because defendants could have each filed their own respondent's brief, we see no ground to strike all respondents' briefs because defendants opted to file two briefs rather than one. Our task, in any event, is to evaluate the merits of the arguments the appellant (here, plaintiff) presents in her opening brief, and we can—and, indeed, *must*—do so regardless of whether there is no, one, two, or ten respondents' briefs on file. (*In re Bryce C.* (1995) 12 Cal.4th 226, 232-233 [in absence of respondent's brief, "the judgment is not automatically reversed," but "can and should be affirmed" if no "'prejudicial error is found"]; *Kriegler v. Eichler Homes, Inc.* (1969) 269 Cal.App.2d 224, 226-227 [burden remains on appellant to demonstrate error].)

**I. Motion for Summary Judgment**

Summary judgment is appropriately granted "where 'all the papers submitted show there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 286 (*Hartford Casualty*), quoting Code Civ. Proc., § 437c, subd. (c).) In other words, summary judgment is warranted where "the plaintiff has not established, and reasonably cannot be expected to establish, one or more elements of the cause of action in question." (*Patterson v. Domino's Pizza, LLC* (2014) 60 Cal.4th 474, 500.) "'"We review the trial court's decision [granting summary judgment] de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained."' [Citation.] We liberally construe the evidence in support of the party opposing summary judgment and resolve all doubts concerning the evidence in favor of that party.' [Citation.]" (*Hartford Casualty*, at p. 286.)

In her opening brief, plaintiff only asserts error with regard to the trial court's judgment on her claims for libel per se and intentional infliction of emotional distress. Although plaintiff's reply brief summarily proclaims that the trial court's judgment with regard to her other five claims is also in error, she makes no argument as to four of the claims and only cursory argument as to the fifth.[5] Plaintiff has therefore doubly waived her appeal as

[5]     Even if we were to consider the merits of the cursorily raised claim, plaintiff's argument in support of it lacks merit. Specifically, plaintiff declares that her cyberstalking claim withstands summary judgment because the defendants' demand emails created a triable issue of fact as to whether they engaged

10

to those claims—for failing to raise them in her opening brief and for failing to present any reasoned argument. (*Tyler v. Children's Home Society* (1994) 29 Cal.App.4th 511, 526, fn. 8 ["[I]t is unfair to raise new arguments for the first time in a reply brief"]; *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 [failure to support assertions with "reasoned argument" amounts to waiver].) We will accordingly address only the two claims properly before us.

### A.    *Libel per se*

To prove libel, the plaintiff must prove "'(1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage.'" (*John Doe 2 v. Superior Court* (2016) 1 Cal.App.5th 1300, 1312; Civ. Code, §§ 44, 45.) To prove libel per se, the plaintiff must also prove that the publication is "defamatory" "on its face"—that is, libelous "without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact." (Civ. Code, § 45a.) To prove libel per se against a particular defendant, the libelous per se publication "must be done *by th[at] defendant*." (E.g., *Live Oak Publishing Co. v. Cohagan* (1991) 234 Cal.App.3d 1277, 1284, italics added.) Because plaintiff's libel per se claim is based solely upon the publication of the website and because it is undisputed that Kirkpatrick was solely responsible for that website, plaintiff is unable to establish an element of her libel per

---

in a "pattern of conduct" within the meaning of Civil Code section 1708.7, subdivision (a)(1). In the operative complaint, however, plaintiff rested her cyberstalking claim solely on the website. As explained below, we necessarily reject plaintiff's attempt to evade summary judgment on a claim based on facts not alleged with respect to that claim in the operative complaint.

se claim against the moving defendants.  As a result, those defendants are entitled to summary judgment on that claim.

Plaintiff responds that her libel per se claim is also based on the statements defendants made on the flyers, in the YouTube video, and to ARIIX.  She urges that her operative complaint makes "broad claims" that the defendants "banded together and hatched a plan"; that the website and emails referenced in the operative complaint were merely aspects of that plan; and that the flyers, the YouTube video, and the statements to ARIIX are "additional aspects of the defendants' plan."  To put a finer point on it, plaintiff characterizes her operative complaint's listing of the website and emails as being *illustrative* of defendants' plan rather than *exhaustive*.  This is inaccurate.  Although the operative complaint alleges that defendants "banded together and hatched a plan," it goes on to allege that "[d]efendants undertook two actions" "[i]n furtherance" of that plan, and at no point indicates that these two actions are just a sampling of that plan; by the plain language of the operative complaint, the website and email *were* the plan.  "The pleadings frame the issues on a motion for summary" judgment (e.g., *Heritage Marketing & Ins. Service, Inc. v. Chrustawka* (2008) 160 Cal.App.4th 754, 764), and while we must "construe[]" the operative pleading "broadly" when deciding whether facts presented at summary judgment are within the issues framed by the complaint (e.g., *Cavalry SPV I, LLC v. Watkins* (2019) 36 Cal.App.5th 1070, 1084), we cannot rewrite the pleading.  Because the operative complaint cannot be read to encompass the flyers, the YouTube video, or defendants' alleged statements to ARIIX without rewriting it, the trial court properly refused to consider plaintiffs' newly proffered facts in support of her libel

per se claim. This refusal is particularly appropriate in light of the "general rule" that the "'words constituting an alleged libel *must be specifically identified, if not pleaded verbatim*, in the [operative] complaint' [citation]" (*Medical Marijuana, Inc. v. ProjectCBD.com* (2020) 46 Cal.App.5th 869, 888, italics added), and here the words from the flyer, in the YouTube video, and uttered to ARIIX are entirely absent.

### B. *Intentional infliction of emotional distress*

To prove intentional infliction of emotional distress, the plaintiff must prove, among other things, ""extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress."" (*Christensen v. Superior Court* (1991) 54 Cal.3d 868, 903.) Conduct is "outrageous" only if it ""exceed[s] all bounds of that usually tolerated in a civilized community""; conduct that merely causes "discomfort, worry, anxiety, upset stomach, concern [or] agitation" is not enough. (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1051.) Because "the attempted collection of a debt, by its very nature, often causes the debtor to suffer emotional distress," a debt collector engages in actionable, "outrageous" conduct only if her conduct "goes beyond 'all reasonable bounds of decency' in attempting to collect the debt," such as when she knows that "the debtor is susceptible to emotional distress because of her physical or mental condition." (*Bundren v. Superior Court* (1983) 145 Cal.App.3d 784, 789-790; *Ross v. Creel Printing & Publishing Co., Inc.* (2002) 100 Cal.App.4th 736, 745 (*Ross*); *Symonds v. Mercury Savings & Loan Assn.* (1990) 225 Cal.App.3d 1458, 1469 (*Symonds*).) Rudeness or insolence by a debt collector is not enough. (*Symonds*, at p. 1469.)

13

Applying this precedent, the trial court correctly granted summary judgment on plaintiff's claim for intentional infliction of emotional distress. As explained above, the undisputed facts establish that defendants were not responsible for the website, so they cannot be held liable for the emotional distress flowing from it; indeed, plaintiff does not argue to the contrary on appeal. And defendants' conduct in sending five emails over the course of three weeks was not, as a matter of law, "outrageous" conduct by the defendants who were seeking to collect on what they reasonably believed was a debt plaintiff owed them. In *Girard v. Ball* (1981) 125 Cal.App.3d 772, 787, the court affirmed summary judgment for a creditor on an intentional infliction of emotional distress claim when the creditor sent "two written communications" and made "some telephone requests for payment." Defendants' conduct in sending plaintiff one email each—particularly when those emails were in response to an email conversation plaintiff herself initiated—is even *less* invasive and hence even *less* outrageous.

Plaintiff responds with four arguments. First, she contends that defendants' conduct is outrageous when considered in conjunction with the flyers, the YouTube video, and their communication with ARIIX. As explained above, however, those additional facts are not properly before us. Second, plaintiff asserts that we must consider the five individual emails to be part of a single, "coordinat[ed]" effort—such that she was emailed *five times* by one "collective[]" rather than *one* time by five individuals. This is a distinction without a difference because even one entity sending five emails over the course of three weeks in an attempt to collect a debt is not outrageous as a matter of law. Third, plaintiff proffers that *Kinnamon v. Staitman &*

14

*Snyder* (1977) 66 Cal.App.3d 893, 895-896 (*Kinnamon*), disapproved on other grounds in *Silberg v. Anderson* (1990) 50 Cal.3d 205, 212, 219 dictates a ruling in her favor.  It does not. *Kinnamon* held that a lawyer's conduct in threatening a criminal action to obtain an advantage in a civil action was outrageous enough to withstand a demurrer because such conduct violated the Rules of Professional Conduct.  *Kinnamon*'s rule does not apply to nonlawyers and has in any event been eclipsed by subsequent precedent holding that violations of the Rules of Professional Conduct do not by themselves give rise to an action for damages.  (*Ross*, *supra*, 100 Cal.App.4th at pp. 745-746.) Lastly, plaintiff broadly proclaims that her failure to prove that defendants *intended* to inflict emotional distress necessarily means that they *recklessly* did so.  Aside from the logical fallacy of this proclamation, it is also irrelevant because the absence of outrageous conduct alone is fatal to plaintiff's claim for intentional infliction of emotional distress.

## II.      Denial of Leave to Amend

A trial court has "wide" discretion, "in furtherance of justice" to "allow a party to amend [her] pleading."  (Code Civ. Proc., § 473, subd. (a)(1); *Falcon v. Long Beach Genetics, Inc.* (2014) 224 Cal.App.4th 1263, 1280 (*Falcon*).)  We accordingly review a trial court's denial of a request to amend for an abuse of that discretion.  (*Melican v. Regents of University of California* (2007) 151 Cal.App.4th 168, 175 (*Melican*).)

Although a trial court's discretion to grant leave to amend exists up to and even during a trial (*Melican, supra,* 151 Cal.App.4th at p. 175; *Honig v. Financial Corp. of America* (1992) 6 Cal.App.4th 960, 965 (*Honig*)), courts will not exercise that discretion if amendment would prejudice the other side (*Honig,* at

15

p. 965).  This is why courts consistently hold that a trial court does not abuse its discretion in denying a request for leave to amend made for the first time at the hearing on a motion for summary judgment.  (*580 Folsom Assocs. v. Prometheus Development Co.* (1990) 223 Cal.App.3d 1, 18; *Shugart v. Regents of University of California* (2011) 199 Cal.App.4th 499, 508; *Liebert v. Transworld Systems, Inc.* (1995) 32 Cal.App.4th 1693, 1699; *Knapp v. Doherty* (2004) 123 Cal.App.4th 76, 90; *Distefano v. Forester* (2001) 85 Cal.App.4th 1249, 1264-1265; cf. *Higgins v. Del Faro* (1981) 123 Cal.App.3d 558, 564 [allowing more "liberal[ity]" of amendment upon grant of a motion for judgment on the pleadings].)  Because a motion for summary judgment is, as noted above, tied to the operative pleading, to allow a party to change the pleading at the eleventh hour is to "'move[ the] target'" and to prejudice the party moving for summary judgment by rendering its prior motion a complete waste of time.  (*Falcon*, *supra*, 224 Cal.App.4th at p. 1280.)  This is particularly so where, as here, the party seeking leave to amend has proffered no reason for waiting until the hearing itself to so request.  (*Falcon*, at p. 1280; *Melican*, at pp. 175-176; *Leader v. Health Industries of America* (2001) 89 Cal.App.4th 603, 613; but see *Kirby v. Albert D. Seeno Constr. Co.* (1992) 11 Cal.App.4th 1059, 1067-1068, 1069, fn. 7 [amendment permitted as to issues "already raised by the pleadings" on file].)  Because plaintiff was aware of the flyers by November 2018, aware of the YouTube video by the time she filed her opposition in October 2019, and aware of the ARIIX communications by July 2015, she had no reason whatsoever to wait until the February 2020 summary judgment hearing to seek leave to amend.  On these facts, the trial court most certainly did not abuse its discretion in denying leave to amend.

16

Plaintiff resists this conclusion with three arguments. First, she asserts that the trial court impermissibly adopted a blanket rule against granting leave to amend at the summary judgment hearing.  Where, as here, the party requesting leave to amend seeks to add wholly new facts and has proffered no basis for the delay in requesting that leave, the trial court's proffered rule is the correct one on the facts.  Second, she contends that the trial court's second basis for denying leave to amend—namely, that plaintiff had alleged the flyer, YouTube video, and ARIIX communications in a prior complaint but later deleted them from the operative complaint—was incorrect, and thus warrants reversal.  However, the trial court was admittedly unsure about this second basis, and more to the point, the trial court's first basis (namely, the untimeliness of plaintiff's request) is sufficient by itself to justify the court's denial of leave to amend.  What is more, the absence of these three facts from any of the prior iterations of plaintiff's complaint means that plaintiff's last-minute request to add them to avoid summary judgment has an even greater prejudicial impact on defendants, who had no prior notice of these factual theories.  Lastly, plaintiff notes that the last deposition in this case was on August 7, 2019, the day defendants filed their motion.  This is irrelevant, because, as noted above, plaintiff knew about most of the new facts long before then and *still* waited until February 2020 to seek leave to amend.

## DISPOSITION

The judgment is affirmed.  Defendants are entitled to their costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.

HOFFSTADT


We concur:


_____, P. J.

LUI


_____, J.

ASHMANN-GERST